**ALLIANCE INS. CO. v. CONTINENTAL GIN CO. et al.　(No. 799–4459.)**

(Commission of Appeals of Texas, Section A. June 16, 1926.)

**1. Insurance ⬤➡127.**

Property in esse and chance of loss are necessary elements of contract of insurance.

**2. Insurance ⬤➡112.**

Contract made by insurance agent by writing policy without insured's knowledge before destruction of property cannot be ratified after destruction.

**3. Insurance ⬤➡229(3)—Where agent notified to cancel policy issued policy in another company proven usage held not to show his authority for insured, and hence new policy was not effective.**

Where insurance company notified agent to cancel policy, and he, unable to locate assured, issued policy in another company, which was not ratified by assured till after property was destroyed, dealings between parties and proven usage relative to writing new policy under such circumstances *held* not to show agent's authority to accept cancellation for insured, and hence old policy remained in force, and new policy did not become effective.

**4. Insurance ⬤➡153—Manual exchange of policies following loss after agent had written new policy held ineffective, where usage was not shown to cover such cases.**

Under usage of insurance agents to write insurance in another company upon receiving notice to cancel and thereafter obtain surrender of old policy without formal notice of cancellation unless insured refused to surrender policy, manual exchange of policies after loss which followed writing of new policy was not effective, in absence of any showing that usage covered cases where loss had occurred.

**5. Insurance ⬤➡153—Usage by which insurance agents wrote policy in another company when notified to cancel certain policy held unlawful in so far as it included exchange of policies after destruction of property.**

Usage by which insurance agents wrote policy in another company when notified to cancel certain policy and obtained exchange of policies subsequently *held* unlawful, in so far as its range included exchange of policies after property had been destroyed.

**6. Customs and usages ⬤➡8.**

Custom exists only where and to extent that usage is harmonious with public policy, common law, statutes, and Constitutions.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Action by the Continental Gin Company and others against the Alliance Insurance Company and another. Judgment adverse to named defendant was affirmed by the Court of Civil Appeals (274 S. W. 299), and it brings error. Reversed and rendered.

Thompson, Knight, Baker & Harris, of Dallas, for plaintiff in error.

Coke & Coke, Locke & Locke, and Ralph Randolph, all of Dallas, for defendants in error.

NICKELS, J.· Handley Gin & Milling Company, a partnership, owned a gin plant, etc.; it owed Continental Gin Company, a corporation, certain indebtedness, to secure payment of which a lien existed on machinery, etc., in the plant. Conn was the general manager and agent of the partnership. An obligation of the Continental Gin Company's mortgage was that the property should be kept adequately insured and for its benefit as its interest was. So far as the latter company was concerned, Conn's authority was the selection (for it) of the insurance companies and procuration of policies from them. Alvin H. Sellers & Co. was the agent, at Fort Worth, of the Providence-Washington Insurance Company, a corporation, and of Alliance Insurance Company, a corporation. In "the fall" of 1919, Conn, through Sellers, upon written application, procured two policies (each for $5,250) on the property, loss payable to Continental Gin Company according to its interest. These policies, according to their terms, would (and did) expire September 30, 1920. · On September 30, 1920, by written application, and through Sellers, Conn procured two like policies of the Providence-Washington Insurance Company for the term of one year. Each of these policies stipulated for cancellation by the insurer upon giving five days' ·written notice to the assureds. The policies were delivered to Conn, and were in his possession thereafter until subsequent to ·October 21, 1920, and until their surrender under circumstances to be named. There was no communication of any kind between Sellers, or either of the insurance companies, on the one hand, and Conn, or his principals, on the other, between September 30, 1920,· and the time of surrender of the Providence-Washington policies.

October 19, 1920, Sellers was notified by Providence-Washington Insurance Company to cancel the two policies last mentioned. His testimony is that:

"We did not immediately cancel the policies as requested, because we could not get into communication with Mr. Conn; we tried to get into communication with Mr. Conn, but he was out of town, and we could not get him."

But, he said:

"We wrote a binder in the Alliance, covering the same property in the same amount, and wrote the policies the following day" (i. e., October 20, 1920).

The two policies (of the Alliance Insurance Company) just referred to were prepared by Sellers by filling in the blanks on forms in his possession (which had been previously

signed by the company through its authorized agent) and by countersigning them, and they were thereafter kept in his possession until the time of the surrender of the Providence-Washington policies.

The property was destroyed by fire on October 20 or 21, 1920. Shortly thereafter Conn went to Sellers' office with the Providence-Washington policies, and for the purpose of interviewing Sellers about proofs of loss, etc. Sellers then (for the first time) informed him that he had canceled the Providence-Washington policies pursuant to request of the company, and had immediately "issued" (for the Alliance Insurance Company) the other two policies. Thereupon, at Sellers' request, Conn surrendered the Providence-Washington policies and received the Alliance policies. Up to that point the assureds had "never dreamed that the Providence-Washington policies were not in force at the time of the fire" (if we may borrow Mr. Conn's language), and they knew nothing whatever of the order to cancel or of Sellers' action thereon or of the so-called "issuance" of the Alliance policies. As stated, there had been no communication whatever in respect to those matters.

Thereafter proofs of loss were made to both insurance companies, and payment was declined by each. Suit was brought by the assureds against both insurance companies, recovery being sought, primarily, against the Alliance Insurance Company and alternatively against the Providence-Washington Insurance Company. The latter company defended upon the ground that its policies had been canceled "by mutual consent," and the other averred its so-called "policies" never took effect. Judgment was rendered against the Alliance Insurance Company for the amount of the policies, with interest, and in favor of the Providence-Washington Insurance Company, by the district court (after trial without a jury), and this was affirmed by the Court of Civil Appeals, Fifth district (274 S. W. 299). To the opinion of affirmance reference is made for a more comprehensive statement of the case.

The theory upon which the trial court and the Court of Civil Appeals proceeded has a double aspect. It is, first, that Sellers, properly, was the agent of the assureds as well as of the insurers, and that his actual ex parte handling of the matter was competent to obligate all; second, that Conn's ratification (after the fire) of what had been done by Sellers theretofore supplied whatever had been lacking in respect to an effective cancellation of the first set of policies and a valid issuance of the others. We cannot agree with the rulings, whether they be rested upon the one thought or the other or upon both in combination. It is our view that those things which in actuality had an ex parte cast retain that nature when measured by relevant principles of law.

[1] Property in esse (with exceptions immaterial here) is the basis of a contract of or for fire insurance. A substantial element is the chance of loss. If either thing be absent (i. e. if there be no property originally or chance of loss be precluded by the certainty incident to pre-occurring fire), the insurance company is in the absurd position of freely offering to pay a large and certain sum (here $10,500) if the insured will pay to it the comparatively insignificant amount of the premium (here, $341.20). Stated another way: In consideration of present payment by one party of the rate named, the other party agrees to pay a larger sum if, and when, a contingency happens; if the contingency does not happen, the one loses the small sum; if it does happen, the other loses the large sum (reduced by the smaller one); and it is entirely nonpermissible to assume that the parties intended to make, or did make, a contract requiring payment of the larger sum if either, or both, of them knew that the contingency, nominally in futuro, had already occurred. When good faith of both parties is assumed and the property does not exist, there is a mutual mistake of fact as to the very subject-matter of the agreement; if the insurer acts in good faith, but the insured knows of the previous destruction, there is present avoiding fraud. Kline Bros. & Co. v. Royal Insurance Co. (C. C.) 192 F. 378, and authorities there cited; Norwich Union v. Dalton (Tex. Civ. App.) 175 S. W. 459. The business of fire insurance has acquired quasi public aspects. Rate regulation has proceeded to the point where improper payment of losses substantially affects the well-nigh common burden. And because of these things, it is our opinion that public policy would inhibit the making or enforcement of an insurance contract in relation to imaginary property, even where both parties so intend.

[2] A fortiori, ratification (rather, adoption) after destruction of the property of that which before the disaster was not a contract of or for insurance is an attempt to do by indirection that which cannot be directly done. The authorities (cases and text-books) cited, contra, may generally be distinguished and, thus, rendered inapplicable upon these grounds: (a) They had to do (or were predicated upon cases having to do) with marine insurance under the English law, contracts governed by principles different from those which apply in fire insurance, as pointed out in Norwich Union v. Dalton, supra, and in Kline Bros. & Co. v. Royal Insurance Co., supra, and as is disclosed, also, in the English case of Grover v. Matthews, [1910] 2 K. B. 401, 79 Law J. K. B. (N. S.) 1025, 102 Law T. (N. S.) 650, 26 Times L. R. 411, 15 Com. Cas. 249. (b) Or they involved or referred to contracts of some kind, and at worst merely voidable, which had been so far consummated as to take effect prior to the loss by fire, e. g.

Dalton v. Norwich Union, as considered and given disposition by the Commission of Appeals (213 S. W. 230). Except as thus distinguishable, and so far else as any of them may be relevant to the question now before us, we do not believe the cited precedents' rest upon sound reasoning. We do not have here a case which involves a contract that is merely voidable; but we do have one where there was a valid contract entered into before the fire (and without need of ratification as in Dalton v. Norwich Union last, supra), or where there was no contract at all prior to the loss in which situation attempted ratification was useless.

[3] The findings and conclusions of the trial court and of the Court of Civil Appeals ultimately rest upon the proposition that Sellers, as agent for the assureds, was authorized to cancel the Providence-Washington policies and to accept the Alliance policies in lieu. We do not consider the effectiveness of the dual agency thus sought to be imposed upon him, or the supposed redelegation of Conn's authority (as agent for the Continental Gin Company) to select the insurance company which should carry the risk, for, in our opinion, the proof offered to show Sellers' authority in this respect affirmatively negatives its existence.

As has been pointed out already, there was nothing in the situation until after the fire to excite in Conn even a "dream that the Providence-Washington policies were not in force at the time of the fire." Conn had selected that company as the one who should take the risks, and to that end had secured and kept actual possession of its policies. There had been no communication of any kind between him and Sellers after their issuance. According to his testimony (and that is without contradiction), Sellers did not "do all of his insurance business," and it had not been the practice of Sellers "to keep the property continuously insured without taking the matter of insurance up with" him (Conn); he did not at any time tell Sellers that he (Sellers) "would have the power or authority to accept notice of cancellation of such policies" (i. e. the Providence-Washington policies) "or either of them, or effect other policies in lieu thereof"; and "there was never any occasion in any conversation that he ever had with this agency for him to make any such statement to them or any of them." Sellers testified to the issuance of the Providence-Washington policies on September 30, 1920, pursuant to Conn's written application, and that they had no further communication until after the fire, and that at no previous time had Conn "told him in effect that he" (Sellers) "was to look after the business in so far as keeping up the insurance was concerned." Whatever evidence there is to show the authorization of Sellers therefore is the proof of usage. There is probable error in the admission of some of the testimony offered to establish the usage, but in view of the fact that the testimony was introduced by the defendants in error, and in view of the conclusions otherwise reached, we do not consider the questions raised in this respect by the plaintiff in error; on the contrary, we treat all of the evidence as being competent.

The usage which we take as proved is thus described by various witnesses:

"After a policy is rewritten in another company, it is then delivered to the assured and the old policy is taken up. If the assured cannot be conveniently reached in person, a short letter is addressed to him, stating that the company has seen fit to cancel his policy, but that the risk has been written in another company, and inclosing the policy and asking for a return of the old policy. A formal notice of cancellation· is seldom sent out. Usually a new policy is delivered and the old policy taken up. If the assured should refuse to surrender the old policy or if he could not be located, formal notice of cancellation would be sent him by registered mail. This exchange of policies is accomplished without deliberation or extended explanation."

Upon receipt of an order to cancel the agent immediately has issued another policy "in substitution."

"It is customary for the agent to follow this action up by seeing in person, telephone or by letter, getting in touch with the assured, or his known agent, and an explanation made for the action and a demand made for the return of the policy ordered canceled."

"It is a custom of the local agents, upon receiving advice of the desire· of the insurance company to retire its liability on a particular risk, to immediately rewrite or bind that particular liability in some other company's office, or in the office of some other agent in his city; after his contract or binder has been issued, he, with reasonable dispatch, acquaints the assured of his action and obtains the policy or a legal receipt for same· that has been required canceled. It is customary for a local agent to enter the information of cancellation on his live file and to enter on the records of the company canceling the information that the policy is canceled only after the document itself or a lost policy receipt or other proper release has been obtained by it and is being at that time mailed to the company."

The basic idea of the usage is that the insurance agent is not the assured's agent; that is, there is no dual agency. Its very subject-matter is the method of securing the assured's consent to termination of the old policy and substitution of the new. As a matter of course, if the insurance agent represented the property owner, there would, obviously, be no occasion for the existence or observance of the usage.

It is manifest that the usage includes a practical interpretation to the effect that "cancellation" of the old policy is wholly unilateral, and therefore ineffective pending communication with, and agreement by, the

holder, for, if that agreement be withheld, notice is then given in the manner provided for in the policy itself. The manual preparation (so-called "issuance") of the new policy is given a like meaning, for there must be an "exchange of policies." Unless the "exchange" is effected through the new and affirmative agreement of the insured, as stated, the insurance agent then proceeds to give the formal notice as provided for in the old policy. Necessarily, it is recognized and contemplated that assent of the insured is required before either the cancellation of the old or issuance of the new policies takes effect. A usage which thus deals with the subject as having an ex parte nature until the exchange of policies is accomplished precludes, instead of establishing, the precedent bilateral character of the agency. Up to the time of the fire, therefore, Sellers had no authority to accept for Conn (or Conn's principals) termination of the Providence-Washington contracts or the Alliance policies in their stead. Per force, liability on the old policies existed at that time, and liability on the new had not commenced.

[4-6] The manual exchange afterward was noneffective, at least as against the Alliance Company, for two reasons: In the first place, there is no evidence whatever that the usage extended to cases where the loss had occurred prior to communication with the insured. Its very nature, as described, in the absence of an affirmative showing to the contrary, projects the thought that it was not practiced to that extent, for, since it is based upon the idea of necessity for the insured's consent, there is an implication that the consent must be procured at a time when the insured may validly give it. In the second place, and for reasons already given, the usage itself, if its range included exchange after the property had been destroyed, would be unlawful, and there would not, therefore, be an operative custom. Usage is the fact. Custom is the law. The fact may include that which is unlawful, and, if so, custom, in legal concept, does not exist or operate to bind the parties. Custom exists only where (and to the extent that) the usage itself is harmonious with public policy, common law, statutes, and constitutions. M. P. Ry. Co. v. Fagan, 72 Tex. 127, 9 S. W. 749, 2 L. R. A. 75, 13 Am. St. Rep. 776; 27 R. C. L. pp. 164. 165.

There was no contract of any kind, therefore, in existence as between the Alliance Insurance Company and the assureds at the time of the loss. Afterward there was no property about which an enforceable contract could be made. The fire terminated the offer to contract which was then, through Sellers as agent of that company, being tendered, because it cut off possibility of subject-matter for a contract.

Providence-Washington Insurance Company joins the other defendants in error in the argument that interest is properly allowable on the policies, and in a prayer for affirmance of the judgment which allows interest on the amount of the Alliance policies. Continental Gin Company and Handley Gin & Milling Company pray that judgment be rendered against the Providence-Washington Insurance Company for the amount of its two policies, with interest, if it be held that the Alliance Insurance Company is not liable. Hence, in view of the conclusions reached on other questions, the assignments as to recovery of interest under the pleading are immaterial.

We recommend reversal of the judgments of the district court and of the Court of Civil Appeals and the rendition of judgment as follows: (a) In favor of the defendants in error, composing the Handley Gin & Milling Company (a partnership), and against Providence-Washington Insurance Company, for the sum of $3,959.72, with interest thereon from October 21, 1920, at the rate of 6 per centum per annum; (b) in favor of Continental Gin Company, and against Providence-Washington Insurance Company, for the sum of $6,540.28, with interest thereon from October 21, 1920, at the rate of 6 per centum per annum; (c) in favor of Alliance Insurance Company, and against all other parties to the suit, adjudging it to be free of liability on or under or by reason of the matters and things involved in the suit.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reversed, and judgment rendered, as recommended by the Commission of Appeals.