**FIRST BANK AND TRUST OF GROVES, Texas, Appellant,**

v.

**Melvin KRAEHNKE, et al., Appellees.**

**FIRST BANK AND TRUST OF GROVES, Texas, Appellant,**

v.

**SOUTHERN COUNTY MUTUAL INSURANCE COMPANY, R.O. Williams, Jr., R.O. Williams, Jr., d/b/a Colonial Surplus Underwriters Agency and R.O. Williams and Co., Inc., Norman Edwards, Norman Edwards d/b/a Colonial Surplus Underwriters Agency, and Colonial Surplus Underwriters Agency, Appellees.**

**No. 09 86 110 CV.**

Court of Appeals of Texas, Beaumont.

May 28, 1987.

Rehearing Denied June 17, 1987.

OPINION

BROOKSHIRE, Justice.

Melvin Kraehnke had been in the trucking business, as an independent trucker, for about 5 years. He had bought a 1980 White autocar tractor costing $56,500.00. He paid $8,000.00 down and the balance was financed at First Bank and Trust of Groves. Initially, Kraehnke had collision and liability insurance through one Guidry, an insurance agent, whose office was in Port Arthur. The White autocar tractor was first used as a dump truck and bobtail truck, hauling 14 yards of material. In May of 1982, the dump box was removed and a fifth wheel attached making the unit into an "18 wheeler". The insurance was with State Farm Insurance. However, when the unit was made into an 18 wheeler, State Farm did not cover such an "18 wheeler" truck as a matter of policy.

*A Partial Factual Background*

On May 27, 1982, Kraehnke approached the R.O. Williams Insurance Company [R.O.W., Inc.] to obtain insurance, contacting one Charles Tuttle. Tuttle was an employee of R.O.W., Inc. Kraehnke explained the type of hauling he would be doing and the area involved. Later, Tuttle called Kraehnke back and quoted the price or premium cost. This price was satisfactory. Kraehnke went to Tuttle's office later that same day. At that time, he saw Tuttle in person. Kraehnke was introduced, briefly, to one Norman Edwards. Edwards' office was in the same building as the office of Tuttle.

That same day, an insurance binder was issued on the Autocar tractor unit for $44,000.00. The binder is in evidence showing that the agency was Colonial Surplus Underwriters Agency, 2508 McFaddin Street, Beaumont, Texas, and the company was Southern County Mutual Insurance Company. The binder was in force from May 27, 1982, to June 27, 1982, insuring the "Autocar" for $44,000. The insured was, of course, Melvin Kraehnke of Winnie. The

Frank M. Lamson, Provost, Umphrey, Swearingen & Eddins, Port Arthur, for appellant.

Gordon R. Pate, Pate & Dodson, Howard L. Close, Orgain, Bell & Tucker, Daniel D. Clayton, Harold J. Laine, Jr., Beaumont, for appellees.

binder provided for $1,000. deductible on a collision loss.

The signature of the authorized representative on the binder is R.O. Williams, Jr. His signature is dated May 27, 1982. On the binder, special conditions and other coverages show the First Bank & Trust of Groves having an interest concerning Item 1, being the "Autocar". Kraehnke said that, on May 27, 1982, when he received the binder, he thought and concluded that he was doing business with R.O. Williams, Jr., and he was certainly aware of all the terms of the binder, including the coverage, the term of the binder and the company involved, being Southern County Mutual Insurance Company. The truck owner, Kraehnke, paid Tuttle over $900. which was delivered and payable to R.O. Williams, Jr. The $900. plus was the quoted first premium payment. The truck owner was to be sent a payment book in which the balance of the premium was to be paid off in 8 monthly installments. Sometime during the week before June 27, 1982, he got back in touch with Tuttle because he had not received his payment book or the policy of insurance covering collision and liability. Kraehnke was aware that time was running out on the May 27, 1982, binder. Tuttle told him that the matter would be taken care of.

On or about June 29, 1982—but dated and effective June 27—a renewal or extension of the binder was executed and the binder was extended to July 27, 1982. It was signed by R.O. Williams, Jr., for R.O. Williams & Co., Inc. Again, Colonial Surplus Underwriters Agency was the agency involved and the company was Southern County Mutual Insurance Company. The insured was Melvin Kraehnke, covering a 1980 White Autocar, with a specific, identifying, serial number, valued at $44,000. The extended binder, again, contained a $1,000. collision deductible clause. A true copy of the renewal binder was received by the Appellant bank, according to its receiving stamp, on July 1, 1982, from Colonial Surplus Underwriters Agency. The insured vehicle was totally destroyed in a collision on July 2, 1982.

We think that it is important to point out that, at the top of the insurance binders, there are, in large lettering, these words:
"THIS BINDER IS A TEMPORARY INSURANCE CONTRACT, SUBJECT TO THE CONDITIONS SHOWN ON THE REVERSE SIDE OF THIS FORM"
It was not a disputed or contested issue that the insured vehicle was totally destroyed on July 2, 1982. *We cannot perceive that the Bank could have done anything further to protect its loan. The Bank had a binder stating that it was a temporary insurance contract and the binder was extended to July 27, 1982.* Colonial Surplus had actual authority to issue both binders by a written agency agreement with Southern County Mutual, as well as by past business practices.

### The Effect of the Insurance Binders

We decide that the governing, controlling, ultimate facts were determined and fixed on the date of the total loss. We conclude that the Bank, as a matter of law, should, and does, recover against the Southern County Mutual Insurance Company, the sum of $36,000., the value of the autocar on July 2, 1982, less $1,000. Both binders showed a lienholder's interest in the Bank.

We hold the Bank was an actual, additional insured, as to its lien interest. The lien interest would be determined as of the date of the total loss, being July 2, 1982. Kraehnke is not a party in this appeal.

### The Amherst Insurance Co. Issue

The Appellees contend that Amherst Insurance Company replaced Southern County on the risk. Amherst issued a policy *after the total loss.* The record reflects that Kraehnke had had a prior unsatisfactory experience with Amherst Insurance Company and he had not been satisfied with the manner of adjusting his prior claim. He said the settlement by Amherst was very slow. It was only after the collision resulting in the total loss of his White Autocar, that he first learned of the Amherst Insurance Company's policy having

been issued at a date subsequent to the total loss.

There was no written binder issued, at any time, in the name of, or by, Amherst Insurance Company. The Appellees aver a telephonic binder was issued by Amherst, in California, in May, 1982. *A week after the total loss, apparently a policy was issued by Amherst Insurance Company but it was never delivered to Kraehnke. The Bank received the policy August 5, 1982, being a month after the loss.* Kraehnke said he would not have accepted Amherst as his carrier.

### Ownership of Colonial Surplus Underwriters

On May 27, 1982, and at all material times thereafter, R.O. Williams, Jr., was the sole owner of Colonial Surplus Underwriters Agency, which was not incorporated. He had a surplus lines license. The surplus lines license was issued to a person in Texas authorizing him to place business in companies that are not authorized or admitted within Texas to do business. On August 1, 1983, Mr. Williams sold the surplus lines agency to Norman Edwards. From May 27, 1982, to August 1, 1983, R.O. Williams, Jr., was the sole owner of R.O. Williams & Company, a corporation, and also the sole owner of Colonial Surplus Underwriters. Edwards was the manager of Colonial Surplus Underwriters, working under Mr. Williams.

### Testimony of Williams Relevant to the Binders

Williams was asked:

"Q And did Colonial Surplus authorize the issuance of that binder, of that extension? Pardon me.

"A It would have to be implied.

"Q Well, there is actually a written extension, is that not?

"A Yes, sir, on there it is, yes.

"Q Was that written extension authorized by Colonial Surplus Underwriters?

"A If they gave us the authority to issue the first one, they would have had to have given us the authority to issue the second one because—

. . . .

"Q Can you answer yes or no to that? Colonial Surplus Underwriters did not—

"A Yes, if we would have had permission to.

"Q All right. Now, tell us how the extension was prepared physically. How did you go about doing this?

"A The way we do the extension is we take—we retake a copy.

"Q Now, we're talking about—

"A —of the binder.

"Q Who is we?

"A R.O. Williams & Company.

"Q All right.

"A Keeps a copy of the binder or it will be Colonial Surplus, whichever one has a copy of the binder, and we simply come in on that binder and type a line, the binder is extended to sign it. *And we normally send it in to the lienholder* and to the insured as a matter of course of business.

"Q Well, the actual binder, extends itself then. Do you Xerox it?

"A Yes, sir. Yes, sir."

(Emphasis added)

Williams acknowledged that the later-issued Amherst policy was never sent to Kraehnke. According to Williams, surplus lines agencies are not permitted to deal directly with the public. Also, Williams admitted further that, if there was a failure to send the extension of the binder of Southern County to Kraehnke, that failure was chargeable to R.O. Williams & Co., Inc. The Colonial Surplus Underwriters had a general agency agreement with Southern County Mutual, which said general agency agreement (granting authority to issue binders and extensions) was in effect on May 27, 1982, and was also in effect on June 27 and 29, 1982, when the renewal binder was signed, issued and delivered to the bank.

Edwards testified that the $900. plus premium had been paid to R.O. Williams & Co., Inc., which, in turn, had paid the premiums to Colonial. Williams testified that Kraehnke did not and, in fact, could not have known of a change or agreed to a

change in insurance carriers since, admittedly, Kraehnke did not receive any notice of any such change of insurance carriers at any time prior to the date of the total loss.

### Bonnie Davis' Testimony

Bonnie Davis was an employee of R.O. Williams & Co., Inc. She testified in behalf of the Defendants. She was the person who actually typed the renewal binder. She testified that she, customarily, would have sent a copy of the extension of the binder to the insured, Kraehnke, the lienholder Bank, and the surplus lines agency, and that she would have kept one for the files of R.O. Williams & Co., Inc.

### Amherst's Receivership

After July 2, 1982, Amherst Insurance Company was placed in receivership by the Pennsylvania Insurance Department and is undergoing the process of liquidation. Amherst had paid nothing on the loss, according to this record.

Amherst Insurance Company did not issue an insurance policy until July 9, 1982, which was a week after the total loss. Edwards testified that the Southern County binder was actually in effect as an insurance policy and afforded insurance coverage on the truck in question when it was issued on May 27, 1982. But Bonnie Davis testified that it was her understanding that Southern County Mutual Insurance Company was the insurance carrier on Kraehnke's truck, since the original binder and extended binder made a binding contract of insurance, on which the first quoted premium had been paid.

### The Cancellation Question

■ In order for the binders to cease being a binding and valid contract of insurance under our facts, the insurer and insured would have had to agree to a cancellation. The burden of pleading and proving such a cancellation was, of course, on the party seeking to establish that cancellation, being Southern County Mutual Insurance Company. It is now settled law in Texas that one who authorizes another to procure insurance for him does not thereby constitute such a person as his agent to receive notice of cancellation or for the purpose of agreeing to a proposed cancellation of an insurance contract. *Shaller v. Commercial Standard Insurance Company,* 158 Tex. 143, 309 S.W.2d 59 (1958); *East Texas Fire Insurance Company v. Blum,* 76 Tex. 653, 13 S.W. 572 (Tex.1890); *Phoenix Ins. Co. v. American Trust & Savings Bank,* 248 S.W. 819 (Tex.Civ.App. —El Paso 1923, writ ref'd).

■ Even when an agent is empowered to insure the property and keep it insured in any company that may be chosen by him, he is not authorized to either cancel, or accept cancellation, of a policy until he has secured other effective, viable, and enforceable insurance coverage. *Security Nat. Fire Ins. Co. v. Gulf Ins. Co.,* 41 S.W.2d 17 (Tex.Comm'n.App.1931); *Westchester Fire Ins. Co. of New York v. Cannon,* 79 S.W.2d 920 (Tex.Civ.App.—Fort Worth 1934, writ dism'd). It is undisputed, under this record, that Kraehnke never received any written notice, or any kind of notice, of the attempted cancellation of Southern County Mutual's coverage. Simply because Tuttle obtained the insurance, he was not made an agent for Kraehnke in attempting to cancel the binders or to change the carriers. Southern County Mutual Insurance Company had the burden to prove an agreement with Kraehnke to cancel the binders. Southern County failed in this. *Buchoz v. Klein,* 143 Tex. 284, 184 S.W.2d 271 (Tex.1944); *Thermo Products v. Chilton Ind. School Dist.,* 647 S.W.2d 726 (Tex.App.—Waco 1983, writ ref'd n.r. e.); *Longoria v. Atlantic Gulf Enterprises, Inc.,* 572 S.W.2d 71 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Gem Jewelry Company of Beaumont, Inc. v. Nolte,* 335 S.W.2d 766 (Tex.Civ.App.— Beaumont 1960, writ ref'd n.r.e.).

### Kraehnke's Acts

The uncontroverted evidence shows that Kraehnke had never done any business, previously, with R.O.W. Co., Inc., Kraehnke's first contact with Tuttle was by phone. The only purpose of his telephone call to Tuttle was to purchase and

provide the proper insurance, including collision insurance, for his truck. Tuttle acquired that insurance requested by Kraehnke. Kraehnke paid for the insurance. Tuttle advised Kraehnke of the fact that he had coverage. Kraehnke accepted his insurance with Southern County Mutual. He made an appointment to pick up the binder. A copy of the binder was sent to the Bank. When Kraehnke picked up or received the Southern County binder, then that ended the relationship between Kraehnke and R.O.W. Co., Inc., Tuttle and R.O. Williams, regarding the obtaining of the insurance. *Shaller, supra. See and compare Alliance Insurance Co. v. Continental Gin Co.*, 285 S.W. 257 (Tex.Comm'n App.1926, rev'd on other grounds). The Commission, in *Alliance, supra*, held that a new policy must be delivered to the insured and the old policy taken up before any effective, lawful cancellation can take place. By necessary logic, we conclude this same rule applies to binders. Further, if the insured should refuse to surrender the old policy or if he could not be located, then a formal notice of cancellation would have to be sent him by registered mail. Clearly, under the holding of *Alliance, supra*, Southern County Mutual was still bound by the original and extended binders, under our facts. *Aetna Ins. Co. v. Texarkana Nat. Bank*, 60 S.W.2d 251 (Tex. Civ.App.—Eastland 1933, writ dism'd). The Eastland court in *Aetna, supra*, decided that the well-established rule was that neither the interest of the insured nor the interest of the lienholder or mortgagee can be canceled without notice to such interested party; or, by an actual, mutual agreement between the insurance company and the lienholder to cancel.

### The Insurance Code on Surplus Lines Insurance

■ *TEX.INS.CODE ANN. art. 1.14-2, sec. 6(a)*, (Vernon 1981) provides:

"*Before any new or renewal insurance* shall be procured in an unlicensed insurer [such as Amherst here] the *agent shall make an affidavit, which shall be promptly* filed with the State Board of Insurance, that he [has made diligent effort] ... to procure from any licensed insurer or insurers the full amount of insurance required to protect the interest of the insured...." (Emphasis added)

This statute was clearly violated by Williams and Edwards. Further, *subsection (b)* specifically provides that:

"Upon *placing a new or renewal surplus line coverage, the surplus lines agent shall promptly issue and deliver to the insured* ... evidence of the insurance consisting either of the policy ... or ... a certificate ... of insurance." (Emphasis added)

This subsection was violated by Williams and Edwards.

■ *Subsection (e)* provides that the surplus lines agent must and shall promptly deliver to the insured a substitute certificate showing the current status of the coverage and the actual insurer's identity and responsibility thereunder. This subsection was clearly violated by R.O.W., Inc., R.O. Williams, and Tuttle. Hence, under the clear, mandatory, statutory law, even though the telephonic binder was issued by Amherst on May 27, 1982, the affidavit required in *sec. 6(a)* of *art. 1.14-2 was not prepared, made or signed until August 30, 1982.*

Furthermore, Edwards admitted that his office did not have a licensed carrier that would cover the risk involved. However, he also conceded that he made no effort to place Kraehnke's insurance with a licensed carrier through some other office. Edwards stated:

"A *We had no licensed carrier in our office. Therefore our only option was to place it with whatever companies we represented.*

"Q Then is it not safe to say *that you did not make any effort* to place it with a licensed carrier?

"A *In that case I would say yes.*" (Emphasis added)

Thereby, Edwards admitted that he violated *art. 1.14-2, sec. 6(a)*. He merely checked with inside his own office. The late affidavit and the failure to obtain coverage in Texas-admitted companies through

other offices, were important, crucial and meaningful violations of *art. 1.14–2*.

■ *TEX.INS.CODE ANN., art. 1.14–1, sec. 7(a)* (Vernon 1981) was violated. Not only did Williams and Tuttle each fail to deliver any Amherst coverage, but there was no showing that the assured, Kraehnke, was ever notified before his total loss of the attempted placing of this insurance with Amherst. Amherst was not licensed to transact insurance business in this State.

*TEX.INS.CODE ANN., art. 1.14–2, sec. 8(a)* provides:

"A surplus lines agent shall not knowingly place surplus lines insurance with financially unsound insurers. The agent shall make a reasonable effort to ascertain the financial condition of the unauthorized insurer before placing insurance therewith. An insurer shall not be eligible unless it has capital and surplus or its equivalent that is adequate in relation to its premium writings and the exposure it assumes."

A surplus lines agent is one who has been granted a surplus lines license pursuant to *art. 1.14–2, sec. 2*.

■ *TEX.INS.CODE ANN. art. 1.14–2, sec. 3* (Vernon 1981), in relevant part, reads:

"Sec. 3. (a) If insurance coverages of subjects resident, located or to be performed in this state cannot be procured from licensed insurers after diligent effort, such coverages, hereinafter designated as surplus line insurance, may be procured from unauthorized insurers subject to the following conditions:

"1. The insurance must be eligible for surplus lines under Section 5."

We conclude Williams and Edwards violated this section and *sec. 5* of *art. 1.14–2*. The record shows that Edwards did not make a diligent effort to procure the required insurance from any licensed insurer or insurers. Rather, he inquired about only those in his own office. Edwards violated *art. 1.14–2, sec. 6(b), (c) and (e)*.

■ *TEX.INS.CODE ANN. art. 1.14–1, sec. 8* (Vernon 1981) legislatively mandates this:

"Sec. 8. Except for lawfully procured surplus lines insurance and contracts of insurance independently procured through negotiations occurring entirely outside of this state which are reported and on which premium tax is paid in accordance with this Article or Article 1.14–2, any contract of insurance effective in this state and entered into by an unauthorized insurer is unenforceable by such insurer. *In event of failure of any such unauthorized insurer to pay any claim or loss within the provisions of such insurance contract, any person who assisted or in any manner aided directly or indirectly in the procurement of such insurance contract shall be liable to the insured for the full amount thereof pursuant to the provisions of such insurance contract.*" (Emphasis added)

We decide that the Bank was an insured, under this article, by virtue of its lien. We conclude the Bank was a beneficiary of the above italicized sentence. We stress the words "for the full amount thereof pursuant to the provisions of such insurance contract." Our record clearly demonstrates that neither Williams nor Edwards filed with the State Board of Insurance the affidavit required by *art. 1.14–2, sec. 6(a)* until more than 3 months had expired after May 27, 1982. A filing on August 30th or 31st, 1982, is not a prompt filing with the State Board of Insurance.

Also, neither Williams nor Edwards filed within 60 days with the State Board of Insurance an exact copy of any policy of surplus lines insurance, thereby violating *sec. 6(c)*. This same *sec. 6(c)* was doubly violated in that neither Williams nor Edwards filed with the State Board of Insurance an exact copy of any substitute certificate, cover note or other confirmation of insurance.

Also, R.O. Williams and Norman Edwards, each, failed to promptly deliver to Kraehnke a written document or other suitable evidence in writing of the attempted

change in the identity of insurers from Southern County Mutual to Amherst. This was a direct violation of *sec. 6(e)*.

We hold that R.O. Williams, R.O.W. Co., Inc., and the Colonial Surplus Underwriters Agency, and Norman Edwards, are strictly liable to the Bank for their numerous violations of the mandatory, statutory requirements and *art. 1.14–2*. This article, itself, so dictates; it is highly regulatory and must be strictly adhered to.

### The Insurance Agent's Duty When Writing Surplus Lines Insurance

Undoubtedly, each such agent, involved here, owed to his client a high degree of duty because that agent is the one the insured looks to and relies upon. Frankly, most people do not know which company carries their insurance. The insured must look to the agent he deals with to get the coverage he seeks. That carrier must be one who can, and will, properly and promptly pay claims when they are due. *Cateora v. British Atlantic Assurance, Ltd. of Nassau*, 282 F.Supp. 167 (S.D.Tex. 1968).

In the case of *Trinity Universal Ins. Co. v. Burnette*, 560 S.W.2d 440, 442 (Tex.Civ. App.—Beaumont 1977, no writ), Justice Keith, writing for our unanimous Court of Appeals, wrote:

"The duties of a local recording agent have been succinctly stated in *Cateora v. British Atlantic Assurance, Ltd.*, 282 F.Supp. 167, 174 (S.D.Tex.1968):

'A local agent ... owes his clients the *greatest possible duty*. He is the one the insured looks to and relies upon. Most people do not know what company they are insured with. The insured looks to the agent he deals with to get the coverage he seeks, *with a sound company who can and will properly and promptly pay claims* when they are due. *It is his duty to keep his clients fully informed so that they can remain safely insured at all times.*'" (Emphasis added)

See also *Jack Criswell Lincoln Mercury, Inc. v. Tsichlis*, 549 S.W.2d 255 (Tex.Civ. App.—Beaumont 1977, no writ).

■ Hence, Southern County Mutual Insurance Company is liable to the Bank because, through its fully authorized agents, it issued a valid binder and a valid extension thereof. The binder and extension thereof were, in effect, a temporary insurance policy. The loss occurred before the extension binder expired. Southern County's Beaumont agents, the Appellees, violated "the greatest possible duty". *Trinity Universal Ins. Co., supra.*

### Colonial Surplus Underwriters' Authority to Bind Southern County Mutual Insurance Company

Williams testified that Colonial Surplus had authority to issue the original binder naming Southern County Mutual Insurance Company as the carrier. Concerning the extension of that binder, he answered:

"Q And did Colonial Surplus Underwriters authorize the issuance of the extension of that binder Southern County Mutual—

"A In the normal course of business they really wouldn't have had to. If we pulled it up and the date had not come up, we had not received the policy by that date, then usually it would automatically have been given the authority to begin—we would have automatically ended it for the 30–day waiting for the policy to arrive.

"Q That wasn't my question, Mr. Williams. There was an extension of a binder issued?

"A Yes, sir. Yes, sir.

   \*     \*     \*     \*     \*     \*

"Q So when you issued the extension on June 29, 1982, you intended at that time at least for Southern County Mutual to continue on the risk; is that right?

"A Yes, sir.

"Q And so far as you knew at that time they were the only insurance company on that risk?

"A As far as I knew and the records would indicate."

### Article 1.14–2, and the Public Interest

*Art. 1.14–2, sec. 1* declares that:

"Insurance transactions which are entered into by citizens of this state with unauthorized insurers through a surplus lines agents as a result of difficulty in obtaining coverage from licensed insurers *are a matter of public interest.* The Legislature declares that such transaction of surplus lines insurance is a subject of concern and that it is necessary to provide for the regulation, taxation, supervision and control of such transactions and the practices and matters related thereto by requiring appropriate standards and reports concerning the placement of such insurance; *by imposing requirements necessary to make such regulation and control reasonably complete and effective; ... and by protecting authorized insurers, which under the laws of this state must meet strict standards as to the regulation of the business of insurance....*" (Emphasis added)

### Summary of Testimony of Norman Edwards

Norman Edwards worked in a surplus lines insurance agency for several years. He bought the Colonial Surplus Underwriters Agency from R.O. Williams, Jr., and, by contract, assumed one-half of the contingent liability arising from the case at bar. He specializes in what he refers to as hard-to-place risks. He works closely with retail agencies, like R.O. Williams & Company, Inc. Colonial Surplus agency represents "nonadmitted carriers". These are also known as nonlicensed insurance companies. Edwards described a surplus lines or non-admitted company as a company that did not choose to be domiciled or licensed or regulated in this state. These companies are permitted to write business in this state so long as proper reporting is done and the proper and prompt premium taxes are collected and paid to the State. Edwards said Amherst Insurance Company was unlicensed, nonadmitted and unregulated in Texas and that Southern County Mutual was organized under a charter for a county mutual. He further admitted that an agent first has to make a diligent effort to obtain insurance through a licensed carrier

before obtaining it through an unlicensed carrier. He recognized this was required by law. He became the owner of Colonial Surplus Underwriters in August, 1983. In May, June and July, 1982, he was the manager of Colonial Surplus, but it was wholly owned by R.O. Williams, Jr., as the sole proprietor.

In May of 1982, the State required a special license for a surplus lines agency. Although Norman Edwards was the manager, he had no special license. The special license was held by R.O. Williams, who was also, in addition thereto, a recording agent.

Edwards obtained his license as a surplus lines agent in August of 1983. Tuttle was a soliciting agent with R.O. Williams Co., Inc. Edwards knew the rates of the Southern County Mutual and could quote them from his office. He did quote them to Tuttle. He testified that Colonial Surplus has the authority to bind for Southern County Mutual by an in-house or "within our office transaction". At one point, there was a common entrance to both the office of Edwards and the office of R.O. Williams & Co. These offices had the same telephone number. Tuttle, being a solicitor, was in the same office building. His office was just down the hall from Edwards'. Colonial Surplus did have some other employees at another location. Edwards again testified that he definitely knew the rates of Southern County Mutual and that the risk, in Kraehnke's case, did fall within the rate guidelines.

■ An analysis of his testimony shows that he did not comply with *sec. 6(a) of art. 1.14–2.* No affidavit was made before the insurance binder, in an unlicensed insurer, was issued. He failed to promptly file the affidavit with the State Board. The evidence shows that neither he nor Williams made a diligent effort, or any effort, to procure insurance from an out-of-their-office licensed insurer. Neither Williams nor Edwards complied with *sec. 6(b)* in respect to the Amherst coverage since they utterly failed to promptly issue and deliver to the insured *some evidence of the insurance with Amherst.* Neither Williams nor Edwards, within 60 days after the effectua-

tion of any new or renewal surplus lines insurance, filed with the State Board an exact copy of the policy. As to Amherst, neither the certificate, nor the binder, was filed. Neither Williams nor Edwards followed the mandatory requirements of *sec. 6(e) of art. 1.14–2*, which specifically deals with any change or substitution of the insurers. The surplus lines agent, who usually does not deal directly with the insured, has an affirmative, mandatory duty to promptly deliver to the insured a substitute certificate or cover note or some confirmation—such as a binder—which accurately shows the current status of the coverage and the actual insurer thereunder. Edwards failed to do this or see that the same was done.

As a matter of statutory liability, both Williams and Edwards are liable for the total loss of the White autocar or truck. Williams, both directly and indirectly, and Edwards, aided indirectly, if not directly, in the attempted procurement of the alleged insurance contract with Amherst.

Concerning Colonial Surplus' efforts to obtain a licensed carrier, we find these questions propounded to Edwards and his answers:

"Q In this instance, did Colonial Surplus make an effort to place this policy with the licensed carrier?

"A Whoever would—Whoever we—You know, we had at that time, we would have made an effort.

"Q Did you not testify in your deposition that at that time Southern County— Colonial Surplus did not attempt to locate licensed carriers?

"A At that time?

"Q That was not your job?

"A That's right.

"Q All right.

"A We weren't—We didn't have any licensed carriers.

"Q So in the case of Mr. Kraehnke at least we know that Colonial Surplus made no effort to locate, place this insurance with a licensed carrier, don't we?

"A That's because we didn't have one."

\*      \*      \*      \*      \*      \*

"Q So if there was a mistake in the quoting of the rate it was made by Colonial Surplus?

"A Right.

"Q And basically that's your understanding of what happened, is it not?

"A That's the way I recall it, yes."

The affidavit required by *art. 1.14–2, sec. 6(a)* was not made or subscribed and sworn to by R.O. Williams, Jr., until about the 30th day of August, 1982. Edwards admitted that it was his responsibility to see that these affidavits were timely prepared and filed. His failure amounted to a direct statutory violation. After a spirited dialogue, we find this:

"Q I believe we're playing on words here, are we not? What efforts, if any, did you or people working for you make to procure Mr. Kraehnke's insurance with a licensed carrier?

"A We had no licensed carrier in our office. Therefore our only option was to place it with whatever companies we represented.

"Q Then is it not safe to say that you did not make any effort to place it with a licensed carrier?

"A In that case I would say yes."

This action was a clear statutory violation. We need not overextend this already lengthy opinion. It is clear that both R.O. Williams and Norman Edwards violated the statutory law as set forth herein. An extension of the written binder was not filed with the Board. And the surplus lines agent, being the recording agent, Williams, did not deliver any policy of Amherst to Kraehnke or to the Bank. Edwards knew that Williams was required, under the law, to deliver a copy of any substitute or extension agreements to the insured, but Kraehnke never received a copy of Amherst's policy until a period of time after the total loss of his Autocar. Hence, again, *art. 1.14–2, sec. 6(e)* was violated directly. We find specifically:

"Q Was a copy of the Amherst policy ever filed with the State Board of Insurance as far as you know?

"A No.

. . . .

"Q Do you know that the agent is required under law to deliver a copy of any substitute or extension agreements? Are you aware of that?

"A Yes.

. . . .

"Q Are you aware that he [Kraehnke] under the law is entitled to a copy of that policy or to the policy?

"A Yes.

"Q In fact, that's an obligation of the agent to get it to him, right?

"A Yes.

"Q Would that be Colonial Surplus' obligation?

"A No.

"Q Would that be R.O. Williams Company obligation?

"A Yes."

. . . .

"Q If Mr. Kraehnke was not notified then somebody violated the law. You understand that, do you not?

"A If that was the law that would be the case.

"Q Do you know that under the law the agent is required to deliver to the insured any substitute certificate or cover letter or enforce a binder if one is issued?

"A I think that's correct.

"Q And if Mr.—If one wasn't delivered to Mr. Kraehnke it was a violation of the law; is that right? So far as you know.

"A So far as I know."

The Amherst policy was not typed up until July 9, 1982. This was done in California. Later, it was mailed to Texas.

*Summary and Conclusions*

It is conclusively shown that Kraehnke conveyed a security interest in the White Autocar to the Bank and that the original binder and the extension binder recited on their faces that the Bank had a lienholder's interest in the White Autocar and that the Bank was to be paid as a lienholder and loss payee according to the Bank's interest. R.O. Williams, Jr., signed and issued the first binder. His secretary, Bonnie Davis,

with full authority, affirmed by Williams, signed his name for R.O. Williams & Co., Inc., on the extension. The extension binder showed the same coverage as the original binder.

The Bank did not receive a copy of the Amherst policy until August 5, 1982, more than a month after the total loss; Kraehnke never received a copy of the Amherst policy. Kraehnke never received anything in writing, or verbally, from Amherst before the total loss; nor did he receive notice of the attempted change of insurance carriers.

Williams testified, unequivocally, that Southern County Mutual Insurance Company was not an admitted company under Texas law. Hence, this query is posed: Under *TEX.INS.CODE ANN. art. 1.14–2, sec. 6(f)* (Vernon 1981), could there have ever been a change in insurance carriers from Southern County Mutual to Amherst? We conclude: "No." Indeed, *TEX.INS. CODE ANN. art. 1.14–1, sec. 8* and *art. 1.14–2, sec. 6* (Vernon 1981), we hold, make the agents, Williams and Edwards, liable to the Bank because the Amherst policy was unlawfully sought and Amherst wholly failed to pay the loss. Tuttle was not a party to the suit.

Southern County Mutual Insurance Company had filed, below, cross-actions against Norman Edwards, R.O. Williams, Jr., and R.O.W., Inc., and the Bank had filed and urged a motion for judgment n.o.v. Also, since the Amherst policy was not even typed or issued until after the total loss of the Autocar occurred, we decide that this distinguishes the case subjudice from the cases relied upon by the Appellees. Indeed, under the facts of this record, we construe the wording of the binder and its extension to mean that these binders are terminated only upon the issuance of an insurance policy by Southern County Mutual Insurance Company, itself.

The Appellants, at oral submission and in their written brief, argue that we apply the concept of strict liability because of the violations of the articles of the Texas Insurance Code referred to herein. We agree. We think a more apt and descrip-

tive term would be strict statutory liability imposed by the enactments of the Texas Legislature. As an example, even when the late affidavit, concerning Amherst, was attempted to be executed, Williams did not sign the same. Only a stamp of his signature was used; he did not actually swear to the truthfulness of the late affidavit.

■ This record establishes that, in the process of attempting to obtain the Amherst policy, *TEX.INS.CODE ANN. art. 1–14–2, sec. 6(a) and (b)* (Vernon 1981) were violated. Since neither Kraehnke nor the Bank were notified, in any manner, of the attempted change of insurance carriers from Southern County Mutual Insurance Company to Amherst, we find that *TEX. INS.CODE ANN. art. 1.14–2, sec. 6(e)* (Vernon 1981), was also violated. We hold that, where insurance coverage is placed with an unauthorized, unlicensed insurer, in violation of *TEX.INS.CODE ANN. art. 1.14–2, sec. 6* (Vernon 1981), such coverage is not lawfully procured. *TEX.INS.CODE ANN. art. 1.14–2, sec. 3(a)* (Vernon 1981).

■ Where surplus lines insurance is unlawfully obtained and the unauthorized, unlicensed insurer fails to pay a claim or loss pursuant to the provisions of such insurance contract, any person who assisted or, in any manner, aided, either directly or indirectly, in procuring the insurance is liable to the insured for the full amount of the loss pursuant to the provisions of the insurance contract—in our case, the insurance binders. *TEX.INS.CODE ANN. art. 1.14–1, sec. 8* (Vernon 1981). We have concluded that the Bank is in the nature of another insured as well as a third party beneficiary under the binders. To hold otherwise, we conclude, would result in a narrow construction in the application of *TEX. INS.CODE ANN. art. 1.14–1, sec. 8* (Vernon 1981). Indeed, a construction of this article which excluded loss payees who were actually known to the parties or agents, who assisted or aided, either directly or indirectly, in procuring such unlawfully obtained insurance, would eviscerate the statutory scheme by which unauthorized, unlicensed and unregulated insurance companies may conduct business in Texas.

Furthermore, such a narrow construction would defeat the statutory scheme from fully attaining its stated purpose. One such cardinal purpose is to protect "residents of this state against acts by persons and insurers not authorized to do an insurance business in this state by the maintenance of fair and honest insurance markets ... by protecting authorized persons and insurers, which are subject to strict regulation, from unfair competition by unauthorized persons and insurers and by protecting against the evasion of the insurance regulatory laws of this state...." *TEX. INS.CODE ANN. art. 1.14–1, sec. 1* (Vernon 1981).

■ We hold that the term "the insured", as used in *art. 1.14–1, sec. 8*, included a loss payee or a valid lienholder that was known to the parties and the agents. The evidence in this record is conclusive that the Appellees, R.O. Williams, Jr., R.O.W., Inc., and Norman Edwards, each, aided or assisted, either directly or indirectly, in attempting to procure the Amherst policy. It is undisputed that the loss suffered by the Bank was definitely within the provisions of the binder. The jury found that the full amount of the total loss was $36,000., being the market value of the Autocar, less $1,000. deductible, being $35,-000. The Bank conclusively proved that, at the time of the loss, its lien interest—granted to it by Kraehnke—in the White Autocar specifically covered, was considerably more than $35,000.

Hence, we adjudge and order that the Bank recover, firstly, $35,000. plus interest from date of judgment, from R.O. Williams, Jr., R.O.W., Inc., and Norman Edwards, jointly and severally; secondly, that the Bank recover the same amount from Southern County Mutual Insurance Company; also, jointly and severally against the Appellees.

Under this record, we conclude that the trial court erred in denying the Bank's Motion for Judgment N.O.V. against Southern County Mutual for the reason that Southern County Mutual failed in its burden to plead and prove that Williams was Kraehnke's agent for the purpose and with

the authority of agreeing to a cancellation of Southern County Mutual's binders. We agree with the Bank's position that the evidence demonstrates, as a matter of law, that the binder and its extension were legally in full force and effect. They were legally binding insurance contracts on July 2, 1982, the day the White "Autocar" owned by Kraehnke was in a collision resulting in its total loss. Williams, himself, testified to this crucial fact. The Bank had a valid, subsisting first lien on the "Autocar" as a "loss payee", having advanced a great part of the original purchase money. The Bank had received a correct copy of the binder before the total loss.

We also decide that error was committed in denying the Bank's N.O.V. motion against Southern County Mutual because the record shows, as a matter of law, that R.O.W. Co., Inc., was, in no sense, Kraehnke's agent for the purpose of authorizing cancellation of Southern County Mutual's binder, and in attempting to substitute therefor the policy of Amherst Insurance Company, soon to be placed in receivership. Amherst was unable to pay any part of the $36,000.00 total loss.

In our view, under this opinion, the Bank's point of error arguing for relief and judgment against the other Appellees is not an alternative point of error which we are not to consider or decide. Hence, we have determined herein that R.O. Williams & Company, Inc., R.O. Williams, Jr., individually and as sole owner of Colonial Surplus Underwriters Agency, and Norman Edwards, individually and now the sole owner of Colonial Surplus Underwriters Agency, are jointly and severally liable to the Bank because of the strict liability and the statutory liability imposed upon each of them by reason of their failure to comply with *TEX. INS.CODE ANN. art. 1.14–2, sec. 6* (Vernon 1981), as well as their failure to comply with *TEX.INS.CODE ANN. art. 1.14–1, sec. 8* (Vernon 1981), providing for and fixing their liability to pay the full amount of the loss "pursuant to the provisions of such insurance contract." In the case sub judice, the binders were the insurance contracts. Williams so testified, clearly and definitely and without equivocation.

Kraehnke wanted his insurance with Southern County Mutual to stay in full force and effect. Indeed, he called about it and asked when he would receive his premium payment book. Tuttle assured Kraehnke his coverage was in effect.

We disagree with *TEX.R.APP.P. 81(b)(1)* both as to its wisdom and soundness. *Rule 81(b)(1)* is unfair to the Appellant under this record because it disallows a new trial on a part of the case that is clearly separable, when such a separate trial would be on unliquidated damages alone if the liability issues are contested. Attorney's fees for the Bank may be in the nature of unliquidated damages. Damages for pain and suffering are correctly termed unliquidated damages. Nevertheless, no properly presented point of error is briefed on this issue. But the Bank does additionally recover $3,675.00 in attorney's fees from R.O. Williams, Jr., R.O. Williams & Co., Inc., and Colonial Surplus Underwriters Agency.

Nothing herein is to be construed as limiting Southern County Mutual's rights to recover from the other Appellees.

REVERSED AND RENDERED.

BURGESS, Justice, dissenting.

I respectfully dissent. The majority has failed to place this case in its proper perspective. This was a jury trial. The jury answered all factual issues against appellant. Appellant's first three points of error complain of the trial court's failure in denying appellant's Motion for Judgment N.O.V.. The next two points of error allege the trial court erred in entering a judgment based on the jury's verdict because there is no evidence or insufficient evidence to support the jury's answer to special issue no. 1. The final point of error, an alternative point, is that, in the event the trial court was correct in entering judgment in favor of Southern County Mutual, then the trial court erred in not granting appellant's Motion for Judgment N.O.V. against the other appellees based upon a violation of *TEX.INS.CODE ANN. art. 1.14–2* (Vernon 1981). The majority

goes further than appellant requests and renders a judgment against all appellees. Even appellant seems to recognize that if the judgment is to be entered against Southern County Mutual on the basis of a valid binder in effect at the time of the loss, then there can be no recovery based upon the statutory violations.

Appellant has a heavy burden when complaining of the trial court's denial of the Motion for Judgment N.O.V.. When considering such a motion, all testimony must be considered in the light most favorable to the party against whom the motion is directed. *Dowling v. NADW Marketing, Inc.,* 631 S.W.2d 726 (Tex.1982). Only the evidence and inferences therefrom that support the jury's findings should be considered, with all contrary evidence and inferences being rejected. *Dodd v. Texas Farm Products Co.,* 576 S.W.2d 812 (Tex. 1979). A judgment n.o.v. is proper only when the rendition of a directed verdict would have been proper. *TEX.R.CIV.P. 301.*

Appellant sought to recover on various theories. The first theory was that a valid binder issued by Southern County Mutual Insurance Company existed on the date of the loss. The jury was asked, without objection, this very issue:

SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that a valid binder of insurance existed between Melvin Kraehnke, with First Bank and Trust as leinholder [sic] and Southern County Mutual Insurance on July 2, 1982?
Answer "We do" or "We do not"
ANSWER: ___We do not___

Under the appropriate standard of review, I do not fathom how the majority can hold, as a matter of law, that there was such a valid binder. In reviewing the evidence in support of the jury's verdict one finds that no one, either on behalf of Melvin Kraehnke or on behalf of Southern County Mutual intended for the binder of May 27 to be renewed on June 27. At best, it was a unilateral mistake by Mrs. Davis when she typed in the name of Southern County

Mutual on the renewal. There may have been negligence on someone's part, but such negligence cannot create a contractual relationship between Southern County and Kraehnke. I dissent, therefore, to the majority's reversing the jury's finding and rendering a judgment against Southern County Mutual Insurance Company.

Next, I dissent to the majority's rendering a verdict against the remaining appellees. The majority reaches such a result based upon statutory violations. In the first place, I believe there are factual issues which should have been presented to the fact finder regarding these alleged violations. This court cannot now find those facts. My main disagreement, however, is the inclusion of appellant as an "insured" under the statute. I must assume that the Texas Legislature knows what an "insured" is and knows what a "loss payee" is. I also must assume they recognize there is a difference between the two. I must further assume that if the legislature had intended to include "loss payee" in the statute, they would have either defined "insured" to include a "loss payee" or would have specifically included "loss payee". They did not nor would I.

Therefore, for all the reasons stated, I respectfully dissent and would affirm.