CLASSIC MOTEL, INC., Plaintiff,

v.

CORAL GROUP, LTD., Jaydev Purchasing Group Corporation, and Jaydev Patel, Individually, Defendants.

Civ. A. No. J90–0160(W).

United States District Court,
S.D. Mississippi,
Jackson Division.

July 13, 1993.

Yogesh K. Nanji, Jackson, MS, for plaintiff.

Frank D. Montague, Jr., Hattiesburg, MS, Robert C. Compton, El Dorado, AR, for defendants.

## MEMORANDUM OPINION

WINGATE, District Judge.

Before this court is the motion of corporate defendant Jaydev Patel Purchasing Group ("defendant" or "JPPG") for summary judgment pursuant to Rule 56(b), Federal Rules of Civil Procedure.[1] Plaintiff's first amended complaint, filed on December 27, 1990, sets forth four counts. Count I alleges tortious breach of contract. Count II is a claim against defendants for bad faith, negligence and breach of contractual duty. Count III alleges certain federal and state statutory violations. Count IV is a claim for punitive damages. By the express language of its motion, the defendant moves for summary judgment as to Counts II, III, and IV only.[2] For the reasons which follow, the court grants defendant's motion relative to Count III, but denies same as to Counts II and IV.

### PARTIES AND JURISDICTION

Plaintiff Classic Motel ("plaintiff" or "Classic") is a corporation organized and existing under the laws of Mississippi. Classic's principal place of business is in Jackson, Mississippi.

Individual defendant Jaydev Patel is an adult resident citizen of New Jersey, which is also his principal place of business. By an earlier Order, this court dismissed defendant Patel from this action pursuant to Rule 12(b)(2), Federal Rules of Civil Procedure,[3]

---

**1.** Rule 56(b) of the Federal Rules of Civil Procedure provides:

(b) For Defending Party. A party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

**2.** In its motion for summary judgment, the defendant only mentions and/or discusses Counts II, III and IV. Defendant's memorandum brief in support of its motion for summary judgment

does not as clearly distinguish between Counts I and II.

**3.** Rule 12(b)(2), Federal Rules of Civil Procedure, provides as follows:

(b) How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (2) lack of jurisdiction over the person, ...

on the grounds that this court lacks jurisdiction over his person.

The movant here, defendant Jaydev Patel Purchasing Group ("JPPG") is a foreign corporation incorporated under the laws of Texas. JPPG's principal place of business is in Dallas, Texas.

Defendant Coral Group Limited ("Coral Group") is a foreign corporation registered and/or incorporated under the laws of the Turks and Caicos Islands, a territory of the British West Indies. Coral Group's principal place of business is Hibiscus Square, Grand Turk, Turks and Caicos, British West Indies. Coral Group has yet to answer its summons or make any appearance at all in this action.

This matter is before the court pursuant to its diversity jurisdiction, 28 U.S.C. § 1332(a).[4]

### FACTS

This action arises out of a commercial relationship entered into between JPPG, of which Patel was the president, and the plaintiff. Defendant JPPG is an insurance purchasing group, comprised of business entities with similar or related liability risks who desire to purchase liability insurance on a group basis. JPPG was created to service the specific insurance needs of Indian–American hotel owners, who have been particularly hard hit by the declining availability of commercial liability insurance in the early to mid–1980's.

In February 1987, Jaydev Patel, a life insurance salesman well known in the Indian–American community, was approached by Bob Entin, an insurance executive from Miami, Florida, about forming an insurance purchasing group.[5] Entin later involved Alex Bickley, a Dallas attorney, and Faye Sutton, the owner of an insurance agency located in Dallas, Texas.[6] JPPG was incorporated in Texas by the above principals in July, 1987. JPPG contracted with Spring Valley Management Company for it to handle all of JPPG's administrative tasks and day-to-day operations. (Deposition of Jaydev Patel at 28).

In approximately late November and early December 1987, seeking less expensive insurance coverage, the plaintiff contacted JPPG to inquire about commercial property and liability insurance. Classic completed and returned an application for membership in the purchasing group, along with the $75.00 application fee. On December 7, 1987, JPPG sent the plaintiff a premium quote of $12,691.00 for liability and property insurance which the plaintiff paid.[7]

On or about December 10, 1987, JPPG purchased an insurance policy ("policy") from Coral Group on behalf of the plaintiff. Shortly thereafter, the plaintiff received an insurance binder from JPPG in which the plaintiff was named as the insured, JPPG as the agency, Coral Group as the property insurer, and Commercial Lloyds as the liability insurer. The binder provided coverage

4. Title 28 U.S.C. § 1332(a) provides in pertinent part:

   (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between—
   (1) citizens of different States;
   (2) citizens of a State and citizens or subjects of a foreign state; ...

5. Jaydev Patel resided in New Jersey where he was an agent for the New York Life Insurance Company. As far as this court can determine, Jaydev Patel's involvement in JPPG was minimal (see Deposition of Jaydev Patel at pp. 15, 27, 29, and 40), although he was named president of JPPG and did receive commissions of 15 percent on those premiums actually paid to JPPG. (De-

position of Jaydev Patel at p. 19). Jaydev Patel himself admits that his knowledge of commercial insurance was negligible. (Deposition of Jaydev Patel at pp. 14–15).

6. Although Entin, Bickley and Sutton were previously unknown to Jaydev Patel, they appear to have some sort of pre-existing relationship with Coral Group. Entin himself appears to have been an agent for Coral Group. Bickley incorporated JPPG and acted as its legal counsel. (Bickley Affidavit at 1).

7. The $12,691.00 premium included liability limits of $500,000.00, property coverage of $1,000,000.00 for the motel building, $120,000.00 for the contents, $5,000.00 for the signs, and $75,000.00 for lost earnings. The plaintiff negotiated the premium price down to $11,500.00.

from December 10, 1987, until January 10, 1988.

At some later date, the plaintiff received an insurance policy in which the liability insurance policy with Commercial Lloyds had been cancelled and replaced by Coral Group. Plaintiff did not object to JPPG's use of Coral Group as the liability insurer at this time.

On or about July 7, 1988, while the aforementioned insurance policy was still in effect, the plaintiff sustained a loss by fire to a portion of its insured property.

After the July 7, 1988, fire, the plaintiff notified the group of its loss. However, the plaintiff has never received any proceeds from either remaining defendant pursuant to the policy.

## STANDARD

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. To determine whether there are any genuine issues of material fact, the court must first consult the applicable substantive law to ascertain what factual issues are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and *Williams v. Adams*, 836 F.2d 958 (5th Cir.1988). The court then reviews the evidence bearing on those issues, viewing the facts and inferences therefrom in the light most favorable to the non-moving party. *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 79 (5th Cir.1987). Before finding that summary judgment against the non-movant is appropriate, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990); *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In other words, the evidence favoring the non-moving party must be insufficient to enable a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511.

In the summary judgment context, the rules governing the production burden of proof are critically important. The moving party bears the burden of establishing that there are no genuine issues of material fact. *Lodge Hall*, 831 F.2d at 79. To satisfy this burden, the moving party may either submit evidence that negates the existence of some element of the nonmoving party's claim or defense, *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Isquith v. Middle South Utilities*, 847 F.2d 186, 198 (5th Cir.1988); or, if the crucial issue is one for which the nonmoving party bears the burden of proof at trial, the moving party may merely point out that the evidence in the record contains insufficient proof in regard to an essential element of the nonmoving party's claim or defense. *Id.* Once the moving party makes that showing, however, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. *Lodge Hall*, 831 F.2d at 79. The nonmoving party cannot discharge that burden by referring to the "mere allegations or denials" of the nonmoving party's pleadings; rather, the nonmoving party must, either by submitting opposing evidence or by referring to evidence already in the record, set out specific facts showing that a genuine issue exists. Rule 56(e), Federal Rules of Civil Procedure; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, and *Isquith*, 847 F.2d at 198–99.

## ANALYSIS

### Texas State Law Applies

Before addressing the specific claims and legal arguments, this court first must establish which state law applies. The oft-cited case of *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), tells us to apply state substantive law in cases jurisdictionally here under diversity of citizenship. Further, the United States Supreme Court in *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), held that, in diversity cases, federal courts confronted with conflict of laws issues must follow the rules prevailing in the states in which they sit. *See also*

*Moore v. United Services Auto. Ass'n,* 808 F.2d 1147, 1150 (5th Cir.1987).

When one turns to the jurisprudence of Mississippi's conflict of laws, one finds that Mississippi law applies the "center of gravity" doctrine, as expressed in the key case of *Mitchell v. Craft,* 211 So.2d 509, 515 (Miss.1968). The center of gravity doctrine is a flexible multi-factor analysis, the primary underlying purpose of which is to:

> appl[y] the law of the place which has the most significant relationship to the event and parties, or which, because of the relationship or contact with the event and parties, has the greatest concern with the specific issues with respect to the liabilities and rights of the parties to the litigation.

*Id.,* quoting *Craig v. Columbus Compress & Warehouse Company,* 210 So.2d 645, 649 (Miss.1968), quoting 15 A C.J.S. Conflict of Laws § 8(2) (1967). Simply stated, the primary inquiry is "which state has the most substantial contacts with the parties and the subject matter of this action." *Boardman v. United Services Auto. Ass'n,* 470 So.2d 1024, 1036 (Miss.1985). "The 'center of gravity' test is an evaluation of which state has the greatest concern for the rights and liabilities of the parties to the litigation." *Moore,* 808 F.2d at 1151.

The *Mitchell* Court acknowledged that the factors to be considered in the application of the center of gravity doctrine were derived from the Restatement (Second) Conflict of Laws § 145(2). *Mitchell,* 211 So.2d at 515. *Mitchell* involved a tort action for wrongful death, but the following principles, derived from § 145(2), are generally applicable to contract actions as well:

> (2) Contacts to be taken into account in ... to determine the law applicable to an issue include:
>
> (a) the place where the injury occurred;
>
> (b) the place where the conduct causing the injury occurred;
>
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered.

*Id.* at 515.

In *Boardman v. United Services Auto. Ass'n,* 470 So.2d 1024, 1031 (Miss. 1985), the Mississippi Supreme Court further explicated the matter and set out the following two corollary concepts: first, "the law of a single state does not necessarily control every issue in a given case." *Id.* In other words, the center of gravity test is to be applied to each issue and the laws of different states may be appropriate for different issues in the same cause of action. *Id.* Secondly, where the law of another state is determined to apply under the center of gravity test, but that law is "contrary to the deeply ingrained and strongly felt public policy" of Mississippi, then the trial court instead may apply Mississippi's substantive law. *Id.*

Here, Texas law applies because, simply, Texas was the commercial nexus of all the relationships which underlie the present dispute here. The purchasing group's activities here are the central element of this action. All communications between the involved parties were either from or to Texas. The purchasing group was physically located in Texas. The plaintiff was instructed to contact the defendant group exclusively at its offices in Texas. The defendant purchasing group contacted the defendant Coral Group from Texas. The policy itself was arguably purchased in Texas and was definitely transferred to the plaintiff through Texas. Thus, all communications between the parties here were either to, from or through Texas.

## COUNT III

The plaintiff alleges that defendant JPPG violated the following federal and state statutes which regulate insurance purchasing groups.

First, the plaintiff alleges that JPPG violated 15 U.S.C. § 3903(b), (d), (e) and (f) of the Product Liability Risk Retention Act of 1981 and 1986.[8] Whatever plaintiff's

---

**8.** Title 15 U.S.C. § 3903 provides:

**(a) Exemptions from State laws, rules, regulations or orders**

Except as provided in this section and section 3905 of this title, a purchasing group is exempt from any State law, rule, regulation, or order to

claims, they cannot be brought under 15 U.S.C. § 3903 because § 3903 imparts no private right of action.

The standard for determining whether a statute implicitly creates a private right of action was established by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975):

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," (citation omitted) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? (citation omitted). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? (citations omitted). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? (citations omitted).

*Cort* has been described as holding "open the possibility that clear legislative history, with statutory language creating personal entitlements, may create a right of action, even though the statute is silent." *Dillon v. Combs*, 895 F.2d 1175, 1177 (7th Cir.1990).

In 1981, Congress enacted the Product Liability Risk Retention Act, 15 U.S.C. §§ 3901–06, in response to the perception that state laws were frustrating the formation of purchasing groups (middlemen between clients and insurers). Section 3903 exempts most purchasing groups from state regulation. *Dillon*, 895 F.2d at 1175–76.

Congress has explained the general purpose of § 3903 in the legislative history of the Product Liability Risk Retention Act of 1981, Pub.L. No. 97–45, 95 Stat. 949, codified at 15 U.S.C. §§ 3901–06, 1981 U.S.C.C.A.N. 1432, *et seq.*, and the Risk Retention Amendments of 1986, Pub.L. No. 99–563, 100 Stat. 3170, 1986 U.S.C.C.A.N. 5303, *et seq.* As reflected in this history, Congress identified the central problem underlying the need for § 3903 as being the declining availability of commercial liability insurance. The following extract from its history is illustrative:

> During the 99th Congress, the country has been shaken by a crisis in the availability and affordability of commercial liability in-

the extent that such law, rule, regulation, or order would—
  (1) prohibit the establishment of a purchasing group;
  (2) make it unlawful for an insurer to provide or offer to provide insurance on a basis providing, to a purchasing group or its members, advantages, based on their loss and expense experience, not afforded to other persons with respect to rates, policy forms, coverages, or other matters;
    \*    \*    \*    \*    \*    \*
**(b) Scope of exemptions**
The exemptions specified in subsection (a) of this section apply to—
  (1) liability insurance, provided to—
    (A) a purchasing group; or
    (B) any person who is a member of a purchasing group; and
  (2) the provision of—
    (A) liability coverage;
    (B) insurance related services; or
    (C) management services;
to a purchasing group or member of the group.
    \*    \*    \*    \*    \*    \*
**(d) Notice to State insurance commissioners of intent to do business**

  (1) A purchasing group which intends to do business in any State shall furnish notice of such intention to the insurance commissioner of such State....
**(e) Designation of agent for service of documents and process**
A purchasing group shall register with and designate the State insurance commissioner of each State in which it does business as its agent solely for the purpose of receiving service of legal documents or process, ...
**(f) Purchases of insurance through licensed agents or brokers acting pursuant to surplus lines laws**
A purchasing group may not purchase insurance from a risk retention group that is not chartered in a State or from an insurer not admitted in the State in which the purchasing group is located, unless the purchase is effected through a licensed agent or broker acting pursuant to the surplus lines laws and regulations of such State.

surance. Congress has been besieged with complaints regarding huge rate increases, mass cancellations of coverage, and entire lines of insurance virtually unavailable at any price.

1986 U.S.C.C.A.N. 5304. As a solution to this problem, Congress sought to limit state regulations which had previously prohibited the formation of risk retention groups and insurance purchasing groups.

> The bill ... enables persons engaged in business to purchase product liability insurance, ... on a group basis.... Since the group purchase of insurance is currently prohibited or restricted by a majority of states, the legislation preempts such group purchases from these restrictive laws and other laws which prohibit insurers from giving preferential rates, terms, and conditions to groups seeking product liability and related insurance coverage.

1981 U.S.C.C.A.N. 1435–36.

Congress spoke specifically in regards to purchasing groups in House Report No. 97–190, which accompanied the original 1981 legislation.

> There are a number of state laws and regulations which either prohibit "fictitious (organized solely for the purpose of insurance) groups or which impose other restraints on the mass marketing of insurance. At least 35 states today regulate, in some form or other, the collective merchandising of property and casualty insurance.
>
>     *     *     *     *     *     *
>
> It is the purpose of Section 104 to preempt State laws which restrict or hinder the creation or operation of safety groups or other arrangements made to take advantage of the mass marketing programs of any insurance company with respect to product liability or completed operations insurance, ...

1981 U.S.C.C.A.N. 1447–48.

The first *Cort v. Ash* factor, whether the plaintiff is one of the class for whose especial benefit the statute was enacted, does not support the plaintiff's stance that Congress intended to embody a private cause of action in section 3903. There is no evidence whatsoever in the legislative history that the statute creates a federal right in favor of the plaintiff. Inasmuch as the purpose of the legislation here was to make insurance more readily available to all insureds, the plaintiff benefited from § 3903. However, such a general intention to benefit a large segment of society is not the sort of "especial benefit" which constitutes a private federal right of action.

The second *Cort v. Ash* factor, whether there is any legislative intent, explicit or implicit, to create or deny such a remedy, also cuts against the plaintiff. Although 15 U.S.C. §§ 3901–06 preempts state regulations which would prohibit the formation of risk retention groups and purchasing groups, Congress has clearly indicated that the states are still to retain general regulatory oversight over these groups.

> Though the product liability insurance problem is a matter for federal attention, no continuing federal presence is created by the Risk Retention Act. Moreover, state law is preempted only to the extent necessary to carry out the purposes of the Act. Only state laws which prohibit or state laws of a non-chartering state which attempt to regulate, directly or indirectly, the formation and operation of approved risk retention groups or the group purchase of product liability insurance are preempted.

1981 U.S.C.C.A.N. 1435. Congress' specific discussion in regards to subsections (d), (e), and (f) of § 3903, which were created by the 1986 amendment, further underscores Congress' emphasis on state regulatory control:

> The Committee has been presented with allegations regarding commercial abuses by organizations purporting to act under color of the exemptions provided by the 1981 Act. The provisions of this section [§ 3903(d), (e) and (f) ] have been added to the law to provide the States with improved ability to monitor for and take action to prevent abuses from occurring. The notice requirements are designed to give the insurance regulator notice and opportunity to exercise regulatory oversight and the requirement regarding registration for service of process is intended to

facilitate appropriate corrective action by eliminating the possibility that the commissioner will have difficulty providing adequate notice to the group or serving appropriate legal process.

1986 U.S.C.C.A.N. 5314–15. While the above passages point clearly to Congress' desire to afford states some regulatory oversight, nothing in these passages hint of private enforcement rights.

The third *Cort v. Ash* factor, whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff, as seen in the above discussion, also militates against finding a private federal cause of action here. The underlying thrust of the Act is clearly aimed at addressing hurdles erected by the states, not private individuals, which would frustrate the formation of risk retention groups or purchasing groups.

The fourth factor, whether the cause of action is one traditionally relegated to state law, clearly undercuts the plaintiff's argument. Regulation and oversight of the insurance industry has traditionally been the province of the states, not the federal government. Hence, the court concludes that upon the *Cort v. Ash* factors, § 3903 imparts no private right of action.

There is case authority on point which underscores this assertion. In an opinion authored by the Honorable Judge Easterbrook, the Seventh Circuit Court of Appeals has ruled that, in the case of § 3903(f), there is no private right of action, *Dillon v. Combs*, 895 F.2d 1175, 1177 (7th Cir.1990), *reh'g denied* and, *cert. denied*, 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991). Judge Easterbrook's language and reasoning in the *Dillon* decision, however, are sufficiently expansive to embrace subsections (b), (d) and

(e), as well. As Judge Easterbrook observed:

> ... the entitlement to enforce the federal rule generally must be found within the statute in question. Here [the plaintiff] comes up short: the Risk Retention Act does not create a private right to enforce § 3903(f). Quite the contrary, § 3903(g) says that "[n]othing in this chapter shall be construed to affect the authority of any State to bring an action in any Federal or State court." See also § 3903(e). A law that does not "affect" the ability of a state to sue hardly creates a right of action. Another part of the Risk Retention Act, 15 U.S.C. § 3906, added in 1986, does create a federal right of action. Section 3906 says that a district court may enjoin a risk retention group from underwriting insurance if "such group is in hazardous financial condition." [The defendants'] firm is a purchasing group, not a risk retention group. The express right of action in § 3906 stands in contrast to the no-effect clause of § 3903(g). What remains is the conclusion that there is no private right of action to enforce § 3903(f) in federal court.

*Id.*

The reasoning above applies equally to the other subsections of § 3903 at issue here: (b), (d), and (e). None of these subsections contains language which, expressly or impliedly, creates a private right of action. And, on its face, the "no-effect clause" of section (g) upon which Judge Easterbrook relies applies to the entirety of § 3903.

■ Under Count III of its complaint, the plaintiff also alleges that the defendants violated Article 21.54 of the Civil Statutes of Texas and Section 83–55–15 of the Mississippi Code Annotated.[9] Both the Texas and the

---

9. Miss.Code Ann. § 83–55–15 provides as follows:

(1) A purchasing group which intends to do business in this state shall, prior to doing business, furnish notice to the Commissioner which shall:

(a) Identify the state in which the group is domiciled;

(b) Identify all other states in which the group intends to do business;

(c) Specify the lines and classifications of liability insurance which the purchasing group intends to purchase;

(d) Identify the insurance company or companies from which the group intends to purchase its insurance and the domicile of such company;

(e) Specify the method by which, and the person or persons, if any, through whom insurance will be offered to its members whose risks are resident or located in this state;

Mississippi statutes are patterned after the Product Liability Risk Retention Act, 15 U.S.C. § 3903, *et seq.* *See supra,* note 9. Both state statutes mirror the language and purpose of the federal legislation.[10] In fact, both the Mississippi and Texas state statutory schemes in question were designed to compliment the Federal scheme.[11]

This court is persuaded that neither the relevant Texas statute nor the relevant Mississippi statute provides a private cause of action. Nothing in the statutes either directly or indirectly hint that a private citizen may champion a civil lawsuit under their banners. Accordingly, in regards to Count III, the defendant's motion for summary judgment should be granted.

### COUNT II

■ Count II alleges that the defendants are liable for bad faith, negligence and breach of contractual duty. The defendant maintains two basic arguments. First, the defendant argues that the dispute here is essentially a breach of contract claim, and that plaintiff cannot convert a breach of contract claim into a tort claim by alleging negligent performance of the contract. Second, the defendant's major argument is that it fulfilled its contractual obligations to the plaintiff.

According to the defendant, the agreement between the parties is the only express statement of the parties' obligations and the defendant fulfilled its contractual obligations. The defendant specifically points to paragraph (5) of the agreement, which the plaintiff signed:

(5) The obligation of JPPG shall be simply that of managing the purchase of the group insurance and the insurance as such shall be the obligation of the insurer writing the policy of insurance and re-insurance.

*Id.* at 7. Thus, defendant argues that it fulfilled its contractual obligations by supplying the plaintiff with the insurance and, regardless of anything else, it cannot be held liable in tort. The defendant's position is also well characterized by the following statement:

The problem encountered by Classic in getting Coral Group to pay Classic's claim had nothing to do with the contract between JPPG and Classic. That problem stemmed entirely from the contract between Classic and Coral Group. If any contract has been breached, it is the insurance contract between Coral Group and Classic and, as a matter of law, Classic may not recover from JPPG for the breach of that contract.

Contrary to the defendant's assertions, the court is of the opinion that the arguments put forward by the plaintiff are sufficient to defeat the defendant's summary judgment motion as to Count II. According to plaintiff's proof and theory of the case, JPPG engaged in activities which removed it from the federal and state regulatory schemes which governed "purchasing groups." Pur-

---

(f) Identify the principal place of business of the group; and
(g) Provide such other information as may be required by the Commissioner to verify that the purchasing group is qualified under Section 83–55–3(j).
(4) Each purchasing group that is required to give notice pursuant to subsection (1) of this section shall also furnish such information as may be required by the Commissioner to:
(a) Verify that the entity qualifies as a purchasing group;
(b) Determine where the purchasing group is located; and
(c) Determine appropriate tax treatment.

10. In its first amended complaint, plaintiff avers that the defendants violated those sections of Art.

21.54 which correspond to 15 U.S.C. § 3903(d) and (e).

11. Section 83–55–1 provides in relevant part:
The purpose of this chapter is to regulate the formation and/or operation of risk retention groups and purchasing groups in this state formed pursuant to the provisions of the federal Liability Risk Retention Act of 1986 ("RRA"), to the extent permitted by such law. Article 21.54 provides in relevant part:
Sec. 1. *The purpose of this article is to regulate the formation and operation of risk retention groups and purchasing groups in this state formed pursuant to the provisions of the federal Product Liability Risk Retention Act of 1981 (Public Law 97–45) and the regulation of these groups to the extent permitted by law.*

suant to 15 U.S.C. §§ 3903(b)[12] and 3905(b)[13] (and Tex.Rev.Civ.Stat.Ann. Art. 21.54 § 2(9)),[14] purchasing groups by definition are limited to the procurement of liability insurance. JPPG sold property insurance in general, and specifically to the plaintiff. Plaintiff claims that JPPG also failed to notify the Texas state insurance commissioner of its intent to do business in Texas, as required by 15 U.S.C. § 3903(d),[15] and failed to register in its state of domicile as a purchasing group, as required by 15 U.S.C. § 3903(e).[16]

■ Since JPPG can no longer be characterized as a purchasing group, according to the plaintiff, JPPG can only be characterized as an insurance broker or agent. Under Texas law, an insurance agent owes its clients a duty to exercise reasonable skill and judgment when obtaining insurance. *Higginbotham & Assoc., Inc., et al. v. Greer*, 738 S.W.2d 45, 46 (Tex.Ct.App.1987). Plaintiff asserts that the defendant breached the standard below when it obtained insurance from the defendant Coral Group.

> The general rule is that an insurance agent or broker is not a guarantor of the financial condition or solvency of the company from which he obtains the insurance. He is required, however, to use reasonable skill and judgment with a view to the security or indemnity for which the insurance is sought, and a failure in that respect

may render him liable to the insured for resulting losses.

*Id.*

In *Higginbotham*, the plaintiff, an insured, sought to hold his insurance agent liable for his loss when the insurance carrier failed to honor the plaintiff's claim due to insolvency.[17] The *Higginbotham* Court found that the agent exercised reasonable diligence in obtaining insurance from the carrier inasmuch as nothing indicated at the time that the carrier was an unreasonable risk. Therefore, the agent was not negligent. *Id.* at 48.

The *Higginbotham* Court stated the rule as follows:

> [A]n agent is not liable for an insured's lost claim due to the insurer's insolvency if the insurer is solvent at the time the policy is procured, unless at that time or a later time when the insured could be protected, the agent knows, or the exercise of reasonable diligence should know, of facts or circumstances which would put a reasonable agent on notice that the insurance presents an unreasonable risk.

*Id.* at 47.

The *Higginbotham* Court relied on the following factors to ascertain that the defendant agent was not negligent.

> It is undisputed that at the time of procurement [the defendant] had no actual knowledge of any financial instability within the [insurer/carrier], and there is no

---

**12.** *See supra* note 8, at 599, for 15 U.S.C. § 3903(b).

**13.** Section 3905 provides in part:

(b) The exemptions provided under this chapter shall apply only to the provision of liability insurance by a risk retention group or the purchase of liability insurance by a purchasing group, and nothing in this chapter shall be construed to permit the provision or purchase of any other line of insurance by any such group.

(c) The terms of any insurance policy provided by a risk retention group or purchased by a purchasing group shall not provide or be construed to provide insurance policy coverage prohibited generally by State statute or declared unlawful by the highest court of the State whose law applies to such policy.

**14.** Art. 21.54 § 2(9) provides:

(9) "Purchasing group" means any group that:

(A) has as one of its purposes the purchase of liability insurance on a group basis;

(B) purchases such insurance only for its group members and only to cover their similar or related liability exposure, as described in Paragraph (C) of this subdivision;

(C) is composed of members whose businesses or activities are similar or related with respect to the liability to which members are exposed by virtue of any related, similar, or common business, trade, product, services, premises, or operations; and

(D) is domiciled in any state.

**15.** *See supra* note 8, at 599, for 15 U.S.C. § 3903(d).

**16.** *See supra* note 8, at 599, for 15 U.S.C. § 3903(e).

**17.** The action was brought pursuant to the Texas Deceptive Trade Practices Act.

evidence which demonstrates that he reasonably should have known that the coverage would represent an unreasonable risk. [The insurer] was a fully admitted and approved carrier in Texas and therefore was subject to financial analysis and other requirements by the State Board of Insurance. At the time the policy was written, [the insurer] was paying its claims promptly, was paying dividends to its policyholders, and had made an underwriting profit the year before. [The insurer] was rated B+ (very good) by the Alfred M. Best insurance analysis company for the preceding year.

*Id.* at 48. The *Higginbotham* Court concluded, therefore, that "[t]here is nothing in this testimony constituting evidence that a reasonable agent would have known or should have known that PIC constituted an unreasonable risk at the time the insurance was procured, or at any time prior to the loss." *Id.*

Under the rubric articulated in *Higginbotham,* plaintiff here has a colorable claim that the defendant JPPG was negligent in its choice of the Coral Group. Plaintiff has submitted evidence that: in the instant case, JPPG knew that the Coral Group was an unadmitted insurance company physically located outside the jurisdiction of the United States. (Deposition of Jaydev Patel at 166); JPPG also was aware that Coral Group was unrated by any of the insurance industry's rating systems. (Deposition of Jaydev Patel at 121, 123); JPPG did not review Coral Group's financial statement prior to placing the plaintiff's coverage with the Coral Group. (Deposition of Jaydev Patel at 142–43, 148); JPPG did not possess any information in regards to Coral Group's past payment of claims or general financial condition. (Deposition of Jaydev Patel at 143–45, 167); and, despite all of the above, JPPG placed the liability and property coverage of more than 100 hotels and/or motels (members of JPPG)

with Coral Group. (Deposition of Jaydev Patel at 59). It also should be noted that it appears that the officers of JPPG may have some sort of financial interest in the Coral Group. *See supra* note 5, at 596.

The plaintiff also attacks the defendant's summary judgment motion under Texas Ins. Code Ann. Art. 1.14–1, § 8 (Vernon 1981). Plaintiff's argument here is bottomed upon plaintiff's conclusion that JPPG is no longer exempt from state regulation pursuant to 15 U.S.C. § 3903, *et seq., see supra* note 8, for the following reasons: (1) because JPPG sold insurance other than liability insurance contrary to 15 U.S.C. § 3905(b), *see supra* note 13, and Tex.Ins.Code Ann. Art. 21.54 § 8(a);[18] (2) because JPPG failed to notify the state insurance commissioner of its intent to do business in Texas as required by 15 U.S.C. § 3903(d), *see supra* note 8, at 599; and (3) because JPPG failed to register in its state of domicile as a purchasing group as required by 15 U.S.C. § 3903(e), *see supra* note 8, at 599, and Tex.Ins.Code Ann. Art. 21.54 § 7.[19] *See* Plaintiff's Combined Response to Defendants' Motions (with Attachments) and Memorandum Brief in Opposition to Motions for Summary Judgment, Exhibit 3, Letter from Texas State Board of Insurance.

Should JPPG have forfeited its exemption from "any state law, rule, regulation, or order" under 15 U.S.C. § 3903(a) and (b), *see supra* note 8, at 599, then JPPG could be answerable under Tex.Ins.Code Ann. Article 1.14–1, § 8.

Article 1.14–1, § 8, provides as follows:

**Validity of insurance contracts**

Sec. 8. Except for lawfully procured lines insurance and contracts of insurance independently procured through negotiations occurring entirely outside of this state which are reported and on which premium tax is paid in accordance with this Article

---

18. Art. 21.54 § 8(a) provides:
   Sec. 8. (a) A purchasing group located in this state shall not purchase liability insurance from a risk retention group that is not chartered in a state or from an insurer that does not hold a certificate of authority to do the business of insurance in the state in which the purchasing group is located, unless the purchase is effected through a licensed agent acting pursuant to Article 1.14–2 of this code.

19. Sec. 7(a) A purchasing group that intends to do business in this state shall, prior to doing such business, furnish notice to the commissioner of this state....

or Article 1.14–2, any contract of insurance effective in this state and entered into by an unauthorized insurer is unenforceable by such insurer. In event of failure of any such unauthorized insurer to pay any claim or loss within the provisions of such insurance contract, *any person who assisted or in any manner aided directly or indirectly in the procurement of such insurance contract shall be liable to the insured for the full amount thereof pursuant to the provisions of such insurance contract.* (emphasis added).

According to the plaintiff, Coral Group is an unauthorized insurer. The plaintiff also asserts, and it appears to be the case, that "Coral Group Ltd. Insurance is not an eligible surplus lines insurer." Plaintiff's Combined Response to Defendant's Motion, Exhibit 3, Letter from Texas State Board of Insurance. Thus, Coral Group may be an "unauthorized insurer" under the aegis of Tex.Ins.Code Ann. Art. 1.14–1 § 8; it also may be that JPPG "aided directly or indirectly in the procurement of such [an] insurance contract." [20]

The case of *First Bank and Trust v. Kraehnke*, 732 S.W.2d 69 (Tex.App.Beaumont 1987), illustrates the potential applicability of Tex.Ins.Code Ann. Art. 1.14–1 § 8, *see ante* p. 606, to the instant scenario. In *Kraehnke*, the holder of a lien on an insured truck brought an action against the insured borrower when the truck was destroyed. The holder of the lien also brought an action against the insurance agency, insurance agents, and the insurer which issued the binder for the truck. The Texas Court of Appeals held in part that the insurance agents who violated the surplus line insurance statutes, including Art. 1.14–1 § 8,[21] were jointly and severally liable, in strict liability and statutory liability, individually and as sole owners of the defendant underwriters agencies. *Kraehnke*, 732 S.W.2d at 82.

In *Kraehnke*, the insured sought collision and liability insurance coverage for his truck, which was subject to a lien. He obtained said insurance from the defendant agencies. *Id.* at 71–72. Said truck was destroyed on July 2, 1982. *Id.* at 72. The defendant insurance agencies changed the insurance carrier without notifying Mr. Kraehnke or the lienholder bank. *Id.* at 73. The insurance carrier was not licensed in Texas or admitted in Texas. *Id.* at 75 and 79. Neither did the defendants "make a diligent effort to procure the required insurance from any licensed insurer or insurers." *Id.* at 76.

In finding the defendants liable, the *Kraehnke* Court quoted from Tex.Ins.Code Ann. Art. 1.14–1, § 1 (Vernon 1981) in order to illustrate the purposes underlying Texas' statutory scheme of insurance regulation.

> One such cardinal purpose is to protect "residents of this state against acts by persons and insurers not authorized to do an insurance business in this state by the maintenance of fair and honest insurance markets ... by protecting authorized persons and insurers, which are subject to strict regulation, from unfair competition by unauthorized persons and insurers and by protecting against the evasion of the insurance regulatory laws of this state...."

*Id.* at 81.

> The *Kraehnke* Court found that
>
> [a]s a matter of statutory liability, both [agents] are liable for the total loss of the ... truck. Williams, both directly and indirectly, and Edwards, aided indirectly, if not directly, in the attempted procurement of the alleged insurance contract with Amherst.

*Id.* at 79.[22]

In *Southern County Mutual Insurance Company, et al. v. First Bank and Trust of Grover*, 750 S.W.2d 170 (Tex.1988), the Supreme Court of Texas reversed in part and affirmed in part the Court of Appeals deci-

---

**20.** JPPG insured over 100 motels through the Coral Group. Deposition of Jaydev Patel at 59.

**21.** The *Kraehnke* Court based its decision on numerous selections of provision 1.14 of the Tex. Ins.Code Ann.

**22.** Specifically, pursuant to Section 8, the *Kraehnke* court found the defendants liable for "the full amount of the loss 'pursuant to the provisions of such insurance contract.'"

sion in *Kraehnke*. The Supreme Court of Texas reversed that portion of the court of appeals judgment which found the defendant agents and underwriting agencies strictly liable and granted the lienholder recovery against the defendant agents and underwriting agencies. *Id.* at 174. However, the Supreme Court of Texas reversed the relief granted to the lienholder by the court of appeals because it resulted in a double recovery which was theoretically contradictory. *Id.* at 173.

> In both its pleadings and court of appeals brief, the Bank [lienholder] sought relief on two alternative theories. First, the Bank claimed that Southern County Mutual [the initial insurance carrier] was liable because a valid Southern County Mutual binder was in force on the date of the accident. Alternatively, if no binder was in effect, the Bank claimed that ... the other defendants were strictly liable because they had violated selected provisions of the Insurance Code. For if Southern County Mutual was liable to the Bank, this meant that ... the other defendants had satisfied the Insurance Code requirements that govern the placement of surplus line insurance companies in Texas.

*Id.* Accordingly, the *Southern County Mutual* Court held that, since the insurance carrier's liability had been established first, the *Kraehnke* Court's finding of strict liability against the defendants other than the carrier went farther than any relief the plaintiff/lienholder requested and also resulted in an erroneous double recovery for the plaintiff/lienholder. *Id.*

Thus, the reversal was based on an erroneous, and theoretically inconsistent, double recovery which does not negate the *Kraehnke* Court's interpretation of Tex.Ins.Code Ann. Art. 1.14–1, § 8 or the substance of the *Kraehnke* Court's finding of strict liability against the other defendants.

### COUNT IV: PUNITIVE DAMAGES

The defendant argues that the plaintiff's claim for punitive damages must be dismissed pursuant to Rule 56, Federal Rules of Civil Procedure. According to the defendant, JPPG is not liable for compensatory

damages. Further, argues the defendant, the plaintiff's claims are contractual in nature, and, therefore, said claims cannot support a claim for punitive damages. Lastly, the defendant posits that JPPG did not commit an "independent tort" against the plaintiff or wilfully or wantonly cause harm to the plaintiff. Thus, defendant insists that there is no genuine issue of material fact as to any of the foregoing issues, and, therefore, JPPG is entitled to summary judgment as to the issue of punitive damages.

Under Texas law, an action in tort for negligence cannot be maintained unless a defendant's conduct constitutes the breach of a duty imposed by law. The breach of an obligation created by agreement of the parties, either express or implied, is insufficient. *Barker v. Brown*, 772 S.W.2d 507, 510–11 (Tex.Ct.App.1989). Given the foregoing discussion under Count II, it appears that the plaintiff has established the possibility of an independent tort sufficient to survive a motion for summary judgment, i.e., under either the *Higginbotham* theory or the Tex.Ins.Code Ann. Art. 1.14–1, § 8 theory. Admittedly, these torts are related to the breach of the contract at issue. Nonetheless, defendants' argument that they are not separate from the breach of contract claim is misplaced. They may be independent torts because the standard in *Higginbotham* and Art. 1.14–1, § 8 both impose affirmative duties which are independent of the contract itself. In other words, under the rubric of *Barker*, the plaintiff has put forth an argument sufficient to survive summary judgment that the "defendant's conduct constituted the breach of a duty imposed by law." *Barker*, 772 S.W.2d at 510–11.

Under Texas law, an award of punitive damages requires a finding of gross negligence. *See Burk Royalty v. Walls*, 616 S.W.2d 911 (Tex.1981). Texas law permits the assessment of punitive damages to deter future misconduct, punish wrongdoers and to reimburse the plaintiff for remote losses. *Lunsford v. Morris*, 746 S.W.2d 471–72 (Tex. 1988). The *Burk Royalty* Court undertook an extensive review and analysis of the

meaning of gross negligence in Texas law and arrived at the following definition:

> Gross negligence, . . ., should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

*Id.* at 920.[23]

The evidence presented by the plaintiff in regards to Count II is sufficient to survive defendant's motion for summary judgment as to Count IV. Pursuant to *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), here "the adverse party [has] set forth specific facts showing that there is a genuine issue for trial." In other words, the plaintiff here has "present[ed] more than a metaphysical doubt about the material facts in order to preclude the grant of summary judgment." *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, defendant's motion for summary judgment, insofar as it relates to Count IV, should be denied.

### SUMMARY

Persuaded by the enunciated law and undisputed facts, this court grants defendant's motion relative to Count III, but denies defendant's motion for summary judgment as to Counts II and IV. Counts II and IV, along with Count I, survivors of defendant's motion, are to be set for trial.

**SO ORDERED AND ADJUDGED.**

---

**23.** The above definition of gross negligence is known as the *Shuford* standard, as it was first articulated in *Missouri Pacific Railroad Co. v. Shuford*, 72 Tex. 165, 10 S.W. 408, 411 (1888).